WARNARD CONSTRUCTORS, INC. *vs.* NARRAGANSETT BREWING COMPANY.

FEBRUARY 24, 1941.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J. This action in contract was heard by a justice of the superior court, sitting without a jury, who gave a decision for the plaintiff in the sum of $1158.07, which, with interest from the date of the writ, May 24, 1939, mounted to $1227.55. The case is before us on defendant's bill of exceptions under which it presses two exceptions: First, to the denial of its request to file a plea of set-off during the course of the trial; and second, to the decision for the plaintiff in the amount above stated.

Omitting all incidental issues concerning a commission for adjusting loss covered by insurance and compensation for

extra work, which were not proved by the plaintiff or admitted by the defendant, the principal question in this case is the application of an overpayment on one contract in the total amount of $697.24, which the defendant claims should have been credited on another contract between the parties.

On September 21, 1938, a hurricane did great damage to many buildings in this state, creating a situation of emergency. By an undated contract in writing, which was admittedly entered into on or about October 13, 1938, the plaintiff agreed to repair and paint, where necessary, the roofs, skylights, doors and windows, including the replacing of all broken glass, on twelve buildings of the defendant damaged by the hurricane, on the basis of cost plus 10% for overhead, plus 10% for profit, the entire cost not to exceed $3000. This contract is referred to as the "hurricane contract" in the evidence and we will so identify it hereafter. Payments under this contract were to be made on invoices submitted directly by the plaintiff to the defendant. The plaintiff began work under this contract the day following its execution.

While work was going on under the hurricane contract, the parties, on October 27, 1938, entered into another written contract by which the plaintiff agreed to build a concrete floor in the defendant's brewhouse for $3500. This contract is identified by the parties in the testimony as the "brewhouse contract", and we shall continue to so identify it in this opinion. Payments under this contract were to be made on requisitions signed by the defendant's architect. The parties agreed that two payments were made on this contract, one on December 3, 1938 for $1000; and the other on December 17, 1938 for $1500.

The plaintiff claims that the defendant still owes $1000 on the brewhouse contract, and this sum, added to admittedly proper allowances for extras in the amount of $158.07 on the hurricane contract, represents the $1158.07 of the trial justice's decision. The defendant, on the other hand,

claims that by mistake it paid $697.24 over and above the $3000 that the plaintiff should have received under the hurricane contract; and that in the circumstances it is entitled to credit this sum on whatever amount is due to the plaintiff under the brewhouse contract and for extras.

According to a statement dated January 24, 1939, sent by the defendant to the plaintiff before the instant action was commenced, in which statement the payments on the two contracts are combined without specifying on which contract the payments therein mentioned apply, the defendant strikes a balance due from it to the plaintiff of $433.58. This statement was accompanied by defendant's check of January 25, 1939 for that amount, such check bearing on its face the notation: "In full payment to date." The plaintiff did not cash this check and later returned it to the defendant.

The plaintiff contends that the defendant has no right to treat the two contracts as practically one transaction; that the payments on each contract should be applied to the specific contract on which they were made; and that the alleged overpayment of $697.24 on the hurricane contract, which the defendant now seeks to apply to the brewhouse contract on the ground of mistake, was in fact a voluntary payment by the defendant of that amount on the hurricane contract in the course of negotiations for a modification of that contract. The conflicting contentions of the parties require a review of the testimony on this point. Unless otherwise indicated, all dates hereafter mentioned refer to the year 1938.

It appears in evidence that the cost of performance of the hurricane contract did, in fact, greatly exceed $3000, and that the defendant paid the plaintiff $697.24 in excess of the $3000 limit of that contract. The first three of plaintiff's invoices, in the total amount of $2347.20, were duly paid by the defendant. It is important to keep in mind the last one of these three invoices in the sum of $792.92, dated November 5, and paid by defendant's check of November 10,

as it is the basis for the defendant's claim of over-payment by mistake of the sum of $697.24 on the hurricane contract.

The testimony as to how the account under this contract was carried in the defendant's system of bookkeeping is very indefinite. Confining our attention for the present to the above-mentioned invoice of November 5, we find that the plaintiff's invoice contains a detailed statement of the items that make up the invoice. Excepting in one instance, there is a check-mark opposite each item, the exception being a cross opposite and a correction of the amount of one item. At the bottom of the page, in a bold hand, are the figures "1.86 — #195". These figures, check-marks and cross are all in red pencil.

After checking such invoice, the defendant apparently filled in a bill form of its own with such information from the invoice as it deemed necessary. Under the printed heading "Distribution" on this form, we find the typewritten figures "1.86 — #195", the same as those that appear in red pencil on the invoice. There is no explanation in the testimony of the meaning of these figures. In the lower left-hand corner of the defendant's form and under the printed words "Approved for Payment" are the initials "A. McC." and "H 3rd.", written in ink and in different handwriting above the word "Treasurer" in each instance. This form and the invoice are firmly fastened together with staples.

The defendant's check of November 10, in payment of this invoice, was signed by "Arthur McCartney—Assistant Treasurer" and "Countersigned — R. Haffenreffer 3rd — Treasurer." The handwriting and the initials of these names are the same as the handwriting and the initials on the defendant's form approving payment of that invoice. This check, which according to the perforations thereon was paid November 15, is also firmly attached with a staple to the defendant's form and invoice.

It is clear to us from our examination of the above-mentioned instruments that the defendant carefully checked the plaintiff's invoice before payment; that it made an independent record of its own of such invoice for bookkeeping purposes; that such record, with the invoice firmly attached thereto, was submitted for approval to the defendant's treasurer and assistant treasurer before any check was issued; and that the defendant had occasion and did refer to such form and invoice when it attached the cancelled check thereto on its return after payment. In the absence of any explanation in the testimony of the meaning of the figures "1.86 — #195", the inference is strong that they represent a file mark or serial number by which the defendant identified the hurricane contract in its books or accounts.

About the time that the parties entered into the hurricane contract, the defendant adjusted its insurance claim for damage from the hurricane. Herman E. Warner, who represented the defendant in the making of that contract and who later had oversight of the work thereunder until November 28, was present at some of the meetings that resulted in such insurance adjustment. By the middle of November, Warner knew that the cost of performance of the hurricane contract would greatly exceed the $3000 limit of that contract. In these circumstances, he saw R. Haffenreffer, 3rd., the defendant's treasurer, hereinafter referred to as Haffenreffer, on November 14, and told him the then existing situation, with the avowed purpose of securing the defendant's consent to a modification of the hurricane contract.

Herman E. Warner's testimony on this point is as follows: "Q. Did you have any talk with Mr. Haffenreffer at any time about the fact that this (the cost) was going over the upset price in the contract? A. Yes, I did. . . . What date was that? A. November 14. I knew it was going over and I went in there and told Mr. Haffenreffer so; that I was afraid that it was going to and asked him in view of the fact that

it had been such a difficult job to estimate, so difficult in fact that we wouldn't take a lump sum price and wanted to do the work cost plus, and the fact that he had been reimbursed by the insurance company for all of that amount, that I felt he might agree to continuing the work paying only the cost of work and leaving off the profit. . . . Q. What did Mr. Haffenreffer say? A. He said 'Well, I will talk it over with Mr. Corbert, and in the meantime go ahead and submit your invoices as usual', and I did that." The Mr. Corbert mentioned in this testimony is Edward M. Corbert, the defendant's architect.

Haffenreffer admits having such a conversation with Herman E. Warner, but says that his answer was: "I told him I would take it up with my committee", meaning the executive committee of the board of directors. There is no denial by this witness of Warner's testimony that until he, Haffenreffer, talked it over with Mr. Corbert or took the matter up with his executive committee, Warner, in the meantime, was directed to continue to submit his invoices "as usual". It is undisputed that up to about November 28, when Benjamin I. Warner, Herman's father, took charge of the work under the hurricane contract, Haffenreffer did not give Herman E. Warner, or anyone else acting for the plaintiff, an answer respecting the matter that he had taken under advisement.

Herman E. Warner further testified that, following this conversation and in accordance with the instructions of Haffenreffer, he submitted two invoices in the "usual form" before November 28. The first of these invoices, for $1041.04, is dated November 14; the other, for $309, is dated November 21. Upon receipt and payment by check of these invoices, the defendant followed the same procedure as to them that we have hereinbefore described in detail respecting the invoice of November 5. Both of these invoices and the defendant's bill-forms thereto attached bear the same

figures "1.86 — #195", that appear on the invoice of November 5. The amount of these two invoices, $1350.04, added to the amount of the three invoices paid by the defendant before November 14, $2347.20, total $3697.24, or an excess payment of $697.24 on the hurricane contract, which the defendant claims to have made by mistake and now seeks to apply as a credit on the brewhouse contract.

When Benjamin I. Warner took charge of the work on the hurricane contract he also, on November 28, asked Haffenreffer for a modification of that contract to the same extent that had been previously suggested by Herman E. Warner and which Haffenreffer had not answered, except as above set forth. Benjamin I. Warner's testimony on this point, in so far as pertinent, is as follows: "And knowing that the contract was going to run over $3000, . . . I thought it only fair to inform Mr. Haffenreffer of the fact, so I did. And he said, 'Well how much more do you think it will cost', and I said, 'Well I am not sure, I have just been here two or three days, and I haven't all the loose ends pieced together, so that I'll immediately submit an estimate', and he said, 'Yes, I wish you would do it and give it to me this afternoon.' Q. And is this,—was that all that was said? A. That's all that was said. Q. And is this letter,—A. One moment,— Mr. Haffenreffer said to me, 'Well you know Mr. Warner, I'm not the last word. I'll have to take it up with my Board of Directors, but I wish that you would hurry this new estimate to me right away this afternoon', which I did, but when I returned to the brewery with that letter he was not there."

The testimony of Haffenreffer on this point is substantially to the same effect. We note here that Haffenreffer did not say to Benjamin I. Warner, as he did to Herman E. Warner, "in the meantime go ahead and submit your invoices *as usual.*" (italics ours)

The letter mentioned in the testimony of Benjamin I. Warner was written on the defendant's premises by him im-

mediately following his conversation with Haffenreffer and it was delivered by Warner as soon as it had been written. This letter, dated November 28, and signed by Warner for the plaintiff, reads: "The writer is sorry to inform you that the hasty estimate of $3000 for certain hurricane repairs on the plant will be overrun by an amount not to exceed $1300.00. Upon this added amount there will be no 10% profit charge added."

Five invoices, referring to the hurricane contract and dated December 5, 9, 16, 27, and 30 respectively, were submitted by the plaintiff after the above-mentioned conversation of November 28, all without any 10% profit charge. None of these invoices were checked, or copied and approved on bill-forms of the defendant, or paid by it, as was the case with the invoices which the defendant had received from the plaintiff prior to November 28.

Benjamin I. Warner at first testified that Haffenreffer did not give him an answer to the proposed modification of the hurricane contract until he had completed the work under both the hurricane and brewhouse contracts. Later in his testimony he voluntarily corrected such statement, saying that Haffenreffer told him "nothing doing" on "December 10th or 15th", whereupon defendant's counsel commented: "I am glad you brought it out because that's our story too. That's all right, Mr. Warner."

This is a convenient point for a short digression from our statement of facts to consider the defendant's first exception, which concerns the denial of its motion for permission to file a plea in set-off during the course of the trial. The second count in plaintiff's declaration alleges that when the hurricane contract was partly performed, the parties agreed to modify that contract so that thereafter the defendant would pay the actual cost of the work without a 10% profit charge for the plaintiff. Counsel for both parties apparently realized that the plaintiff could not recover under this count

in view of the testimony of Benjamin I. Warner just above quoted. In the circumstances, the defendant moved for permission to file a plea in set-off to this count as a basis for recovery in its own right of the overpayment of the $697.24 in question in this case. This motion, thus made in the course of the trial, was properly denied by the trial justice on the authority of *Battey* v. *Warner*, 28 R. I. 312. The defendant's first exception is overruled.

The ruling just considered, though adverse to the defendant, did not prejudice it in any way, for its witnesses were allowed to testify freely, without objection from the plaintiff, to all matters properly admissible in evidence under a plea in set-off. The manner in which the case was tried by the parties themselves reduced the real issue in this case to a determination of a pure question of fact, namely, whether the payments which the defendant made on the hurricane contract on plaintiff's invoices of November 14 and 21 were voluntary, or whether such payments were made under a mistake of fact.

Resuming our review of the evidence, we find that the defendant's claim of over-payment by mistake rests primarily on the credibility of the testimony of Arthur McCartney, the defendant's assistant treasurer. He testified, in substance, that the over-payment in question resulted from his overlooking, and therefore failing to take into account, payment of plaintiff's invoice of November 5 in the sum of $792.92, to which we directed particular attention early in this opinion.

McCartney's testimony as to how plaintiff's account was kept by the defendant is as follows: "Q. Well, now you have a lot of accounts to handle. A. A great many. Q. And how do you keep track of the payments made? A. The payment (of the November 5th invoice) as I stated before was made on account,—have to be really kept in memorandum because we have no account with any individual creditor

. . . and while our accounts are all paid promptly, and individually, as billed, when it comes to a contract, you have to have account separately from our other books to know how far you are going on that contract,—a memorandum of that transaction. It is entirely outside of our system of payments." No explanation is given by this witness as to how an account of the type now before us was in fact kept "separately" from other books of the defendant, or what he meant by "a memorandum" of such transaction.

It is in this connection and in view of the absence of definite testimony on this point that the figures "1.86 — #195", written in red pencil apparently by the defendant itself on the invoices of November 5, 14, and 21, which reappear in typewritten form on defendant's own bill forms thereto attached, gain significance and have a material bearing on whether payments of the invoices of November 14 and 21 were actually made by mistake. If these figures represent a file mark or serial number with reference to the hurricane contract, which in the circumstances is a fair and reasonable inference, the testimony of McCartney is fairly open to different interpretations and conclusions. This is especially so since there is no testimony from the defendant that the invoice of November 5 was in fact misplaced, or where it was found, if it had been mislaid, when McCartney made up his composite statement of January 24, 1939, in which he credited the brewhouse contract with the $697.24 that the defendant now ·claims to have overpaid on the hurricane contract because of McCartney's mistake.

McCartney also testified that he never was told, by Haffenreffer or anyone else, that the limit of $3000 on the hurricane contract would be or had been exceeded; that he did not discover such a situation until about January 20, 1939, by which time both the hurricane and the brewhouse contracts had been completed; and that he then made up the statement of January 24, 1939.

At plaintiff's request the defendant produced in court the unchecked and unpaid invoices of December 5, 9, 16, 27, and 30, above mentioned. McCartney testified that all invoices received by the defendant are referred to his office; that he never saw those invoices; that they did not come to his office, and that he did not know "where they went to, whether they got into the building." There is no testimony from the defendant explaining how those invoices came into its possession or in whose custody they were prior to their production in court. In rebuttal, Benjamin I. Warner testified that he handed the invoices of December 5 and 9 "personally, into Mr. McCartney's hands."

Haffenreffer testified that he signs hundreds of checks; that when he signed the checks in payment for the invoices of November 14 and 21, which resulted in the overpayment under consideration, he did not know that those payments exceeded the cost limit of the hurricane contract; that he stopped paying on that contract when he discovered this fact, which was shortly after he had signed the check for the invoice of November 21. "Q. Do you remember how you found out about it? A. No. I don't." There is no testimony from him that he then notified Benjamin I. Warner of such fact; or that he then or at any other time prior to McCartney's composite statement of January 24, 1939, told the plaintiff that the invoices of November 14 and 21 were paid by mistake. At this point, it is pertinent to recall that, according to the undenied and uncontradicted testimony of Benjamin I. Warner, it was not until December 10 or 15 that Haffenreffer told him "nothing doing" on the proposed modification of the hurricane contract.

The defendant admits that if the basic question in the instant case is one of fact, depending mainly on the credibility of testimony, it cannot be said that the trial justice was clearly wrong in his finding, as a fact, that payments of the invoices of November 14 and 21 were voluntary pay-

ments and not payments made by mistake. It contends, however, that in the circumstances of this case we are not bound by the rule that the decision of a trial justice on conflicting evidence will not be disturbed by us, unless clearly wrong, because, as it says in its brief: "The facts are undisputed so this court will draw its own inferences." We cannot agree with this contention, and it is for this reason that we have reviewed the evidence at great length.

The evidence is reasonably open to different and contrary conclusions. If, in the light of defendant's conduct and all other surrounding circumstances, the testimony for the defendant were believed, the conclusion might well be that the defendant paid the $697.24 in question by mistake. On the other hand, if it were not believed, then the conclusion might just as readily be that the defendant intended to and voluntarily did pay such sum as an inducement to the plaintiff to proceed with the work under the hurricane contract. It is reasonable to infer from defendant's entire course of conduct, especially from the instructions that it gave to Herman E. Warner, when he notified the defendant on November 14 that the cost would exceed or had exceeded $3000, to go ahead with the work and submit plaintiff's invoices "as usual", and from the further fact that it was almost a month before the defendant answered the plaintiff's suggestion for a modification of the hurricane contract, that the defendant, being anxious to have the emergency work called for by that contract done without loss of time, was willing to and did pay the $697.24 to the plaintiff as a gratuity or bonus, even though it finally refused to modify the hurricane contract itself.

The trial justice, who had the opportunity of seeing and hearing the witnesses, which we do not have, decided that the sum of $697.24 was voluntarily paid and not paid by mistake. Since the determination of this issue involved a question of credibility on conflicting evidence, we cannot

say that he was clearly wrong in his decision. On this basis we find no error in his computation of the amount that the plaintiff is entitled to receive from the defendant.

The defendant's exceptions are overruled and the case is remitted to the superior court for the entry of judgment on the decision.

*Littlefield, Otis & Knowles, Fred A. Otis, John C. Knowles,* for plaintiff.

*Hinckley, Allen, Tillinghast & Wheeler, Harold A. Andrews,* for defendant.